PARIENTE, C.J.
In this case, we adopt a rule of judicial administration that will help this Court determine the necessity for increasing, decreasing, or redefining appellate districts.[1] The new rule is the culmination of the work of the Supreme Court’s Committee on District Court of Appeal Workload and Jurisdiction (Workload and Jurisdiction Committee). The Workload and Jurisdiction Committee consisted of county, circuit and district court judges, a judge of compensation claims, the solicitor general, general counsel to the Governor, private attorneys, an assistant public defender, and the Clerk of this Court. See Committee on District Court of Appeal Workload and Jurisdiction, Report and Recommendations 2-3 (2005) (hereinafter Workload and Jurisdiction Committee Report ).[2]
We approve the Committee’s recommendations, which were submitted without dissent, and adopt new Rule of Judicial Administration 2.036, Determination of the Necessity to Increase, Decrease, or Redefine Appellate Districts. This rule will provide an important comprehensive framework to fulfill this Court’s constitutional obligation to assess the need to increase, decrease, or redefine appellate districts. It specifically is intended to ensure that our district courts of appeal, as the courts of last resort in the vast majority of appeals, continue to dispense justice in a timely and efficient manner that meets the needs of our people.
BACKGROUND
Article V, section 9 of the Florida Constitution provides that the Supreme Court “shall establish by rule uniform criteria for the determination of the need for additional judges except supreme court justices, 'the necessity for decreasing the number of judges and for increasing, decreasing or redefining appellate districts.” (Emphasis supplied.) Further, the Constitution provides that if the Court “finds that a need exists for increasing or decreasing the number of judges or increasing, decreasing, or redefining appellate districts ..., it shall, prior to the next regular session of the legislature, certify to the legislature its findings and recommendations concerning such need.”
As originally adopted, Florida Rule of Judicial Administration 2.035 set forth the procedure and criteria for determining both the need for additional judges, and the necessity for decreasing the number of judges and for increasing, decreasing, or *617 redefining appellate districts. See In re Fla. Rules of Judicial Admin. (Determination of Need for Additional Judges), 442 So.2d 198, 198 (1983). However, as currently drafted, rule 2.035 focuses only on the criteria for determining the need for increasing or decreasing the number of judges and the procedures for certifying the Court’s findings and recommendations concerning that need to the Legislature. See Amendment to the Fla. Rules of Judicial Admin. (Certification of Judges), 888 So.2d 614 (Fla.2004) (amending rule and recognizing that rule sets forth uniform criteria for determining the need for increasing or decreasing the number of judges and procedures for certifying the Court’s findings and recommendations to the Legislature); Amendment to Fla. Rule of Judicial Admin. 2.035, 665 So.2d 218 (Fla.1995) (amending statement of purpose to clarify that the criteria in rule form the primary basis for Court’s determination of need “for additional judges”).
In 2004, we established the Committee on District Court of Appeal Workload and Jurisdiction. See Committee on District Court of Appeal Workload and Jurisdiction, Fla. Admin. Order No. AOSC04-122 (Sept. 22, 2004) (on file with Clerk, Fla. Sup.Ct.). The Workload and Jurisdiction Committee was charged with developing recommendations to the Court “on uniform criteria as a primary basis for the determination of the need to increase, decrease, or redefine the appellate districts.” Admin. Order AOSC04-122 at 2.
The Workload and Jurisdiction Committee submitted its report and recommendations, which include proposed new Rule of Judicial Administration 2.036 to serve as a companion rule to rule 2.035. After considering the Committee’s thorough, well-reasoned report and recommendations, the Court approves its recommendations and adopts proposed new rule 2.036, with minor modifications.
DISCUSSION
A timely and meaningful appeal heard by a fair and impartial tribunal is integral to our system of justice.[3] Appellate review identifies and corrects harmful trial-level errors, ensuring consistent application of the laws and constitutionally guaranteed rights and liberties.[4] A court capable of keeping pace with its caseload is indispensable to this process. An efficient, well-resourced appellate court expeditiously processes appeals and, with the assistance of law clerks and the briefs of counsel, renders thoroughly researched and carefully considered decisions on the issues presented.
Florida’s court structure includes appellate courts known as district courts of appeal. This Court’s limited jurisdiction places district courts in the crucial position of serving as the appellate tribunal of last resort for most litigants. The five district courts of appeal, in raw numbers, have annually received a total of approximately twenty-four thousand cases in recent years, while the Supreme Court has received approximately twenty-five hundred *618 cases.[5] Opinions issued by these courts of appeal join the body of jurisprudence of the state and are subsequently relied on as precedent by judges, attorneys, and parties in other cases.[6]
Committee Report and Recommendations
The Workload and Jurisdiction Committee submitted its report and recommendations to the Chief Justice in October 2005. In performing its work, the Committee reviewed the major developments in Florida’s appellate court system since the creation of the first three district courts in 1957, and built on the substantial body of work amassed by the Judicial Management Council’s Committee on District Court of Appeal Performance and Accountability and its successor, the Commission on District Court of Appeal Performance and Accountability (Performance and Accountability Commission).[7] Workload and Jurisdiction Committee Report at 4. Using information generated under the guidance of the Performance and Accountability Commission, the Workload and Jurisdiction Committee examined detailed filing trends by case type for districts and circuits, dating to 1989 and projected forward through 2015, as well as other relevant research. Workload and Jurisdiction Committee Report at 4-5.
Analysis of the caseloads and trend data led the Committee to conclude that
many commonly held beliefs about factors that contribute to appellate court caseloads, such as correlations to populations, numbers of attorneys, and trial court caseloads are overstated, and that caseloads are also affected by changes in the law, such as those contributing to post-conviction appeals, and changes in trial court practice, such as increased reliance on mediation and other private forums.
Workload and Jurisdiction Committee Report at 5. Indeed, as illustrated in the chart below, examination of caseload trends in the district courts indicates that when examined by type, the volume of appeals in family, probate, and administrative cases (except in the First District) has remained relatively constant and civil appeals have declined, likely due to increased use of mediation and greater stability in the law. On the other hand, criminal case appeals have increased steadily during the same period, fueled by an almost tenfold increase in postconviction appeals.[8]
*619 [[Image here]]
Postconviction cases have had the most dramatic impact on district court caseloads. The extent of this impact on a particular district court’s caseload depends partly on the dispersion of prisoner populations. Jurisdiction to adjudicate petitions by prisoners challenging some aspect of their incarceration lies in the circuit where they are imprisoned, not the circuit where they were convicted and sentenced. See Strategic Planning Unit, Office of the State Courts Administrator, Factors that Impact Caseload in the District Courts of Appeal 13 (2005).
These findings led the Workload and Jurisdiction Committee to conclude that “future caseloads cannot be reliably projected based on linear calculations of populations and other data, but are dependent on uncertain contingencies regarding the legal and social structure.” Workload and Jurisdiction Committee Report at 6. The Committee also found that
judicial workload — the efforts required of judges as distinct from overall court workload that can be carried in part by staff — is less closely related to caseloads than is widely believed. Judicial workload can be substantial for some case types and much less for others. Furthermore, workload continues to be highly influenced by changes in court processes and internal operations, such as the use of staff attorneys and deployment of information technologies that increase judicial efficiency. Thus, assessments and projections of a court’s workload cannot be reliably based on caseloads alone, but must be based on a number of interrelated factors.

Id.

In examining the relationship of the number of judges on a court and overall performance, the Workload and Jurisdiction Committee looked to the 2004 report by the Performance and Accountability Commission, Court Size as it Affects Collegiality and Court Performance. The Committee observed that the Performance and Accountability Commission’s findings established that the widely held “assump-
*620 tion that a court would become less effective when the number of judges on the court approached twenty no longer holds true.” Workload and Jurisdiction Committee Report at 7. This is attributable to “developments in court management practices, the deployment of resources such as central staffs, and the increased sophistication of information-sharing technologies, including video conferencing, e-mail, and document management.” Id. The Commission reported that “larger appellate courts with strong leadership, adequate staff support, well considered case management strategies and appropriate technology can operate with a collegial environment and efficiency similar to or even greater than that of a smaller court.”. Id. at 7-8 (quoting Commission on District Court of Appeal Performance and Accountability, Court Size as it Affects Collegiality and Court Performance 4 (June 2004)).
In light of these conclusions, the Workload and Jurisdiction Committee does not support the- use of arbitrary numerical thresholds to determine when caseload or court size are too ' great. Instead, the Committee advocates an approach that concentrates on outcomes measured through indicia of performance.[9] The Committee states:
The essential question to be asked ... is not whether a court has too many judges, its caseload is too high, or it publishes too few opinions. The relevant question is simply whether, given the totality of the circumstances, Florida’s district courts are able to effectively and efficiently perform their primary functions in service to the people.
Workload and Jurisdiction Committee Report at 8. If the data indicate that the district courts are “struggling to fulfill their mission,” then a redefinition of the appellate districts should be considered.
The Court approves the Committee’s recommended “outcomes-based” approach to assessment of the district courts for purposes of determining the necessity to increase, decrease, or redefine appellate districts. This approach represents the best practices supported by current court management research, see National Center for State Courts, Appellate Court Performance Standards and Measures (1999), and is currently followed in both our circuit and district courts.
Rule 2.036, Determination of the Necessity to Increase, Decrease, or Redefine Appellate Districts and 2006 Review
The Court adopts, with minor modifications, proposed new Rule of Judicial Administration 2.036, Determination of the Necessity to Increase, Decrease, or Redefine Appellate Districts. The new rule provides uniform criteria for the Court’s use in performing the duties mandated by article V, section 9 of the Florida Constitution, and serves as a companion rule to existing rule 2.035, Determination of Need for Additional Judges.
• Eight-year Review Cycle
Subdivision (b) of the rule provides for a review to be conducted every eight years by an assessment committee appointed by the Chief Justice. The Workload and Jurisdiction Committee recommends an eight-year review cycle for several reasons. First, the review process, which will be comprehensive, will constitute a formi *621 dable task for both the assessment committee and the district courts. Second, changes necessitating future reorganization of the district courts will probably emerge gradually, as they have in the past. The Committee also felt that an eight-year cycle is consistent with the Performance and Accountability Commission’s recommendation that appellate case weights be recalibrated every four years. Workload and Jurisdiction Committee Report at 10.
We approve the recommended eight-year review cycle, but have modified subdivision (b) to recognize that a review will be undertaken this year, as explained below.
• Assessment Committee and Review Schedule
Subdivision (b) also provides for the appointment by the Chief Justice of a review committee that will assess the degree to which the district courts are able to fulfill their mission, using the criteria set out in subdivision (d) of the rule. The Chief Justice will appoint an assessment committee, composed of one district judge, one circuit judge, and one attorney from each district, by August 31 of the year prior to the review year. The Chief Justice also will designate the committee chair. Staff support to the assessment committee will be provided by the Office of the State Courts Administrator in consultation with the clerks and marshals of the district courts.
The assessment committee must submit its report by July 1 of the review year. By November 15 of the review year, the Court must certify to the Legislature its findings and recommendations.
• 2006 Review
The proposed review schedule outlined above notwithstanding, we direct that a review by the District Court of Appeal Workload and Jurisdiction Assessment Committee be undertaken immediately.[10] The 2006 review will be conducted in accordance with the criteria, factors, and certification process outlined in the new rule and discussed below. The 2006 Assessment Committee will report its recommendations to the Chief Justice by November 15, 2006. The Court recognizes that this represents a highly compressed time frame in relation to the review schedule outlined in the new rule. However, because data and related research used by the Workload and Jurisdiction Committee are available for the Assessment Committee, the Court is confident that an expedited schedule is achievable. Subsequent reviews will be governed by the schedule set out in subdivision (b) of the new rule.
• Certification Process
The certification process is addressed in subdivision (c) of the rule. This subdivision recognizes that “[t]he certification process balances the potential impact and disruption caused by changes in appellate districts against the need to address circumstances that limit the quality and efficiency of, and public confidence in, the appellate review process.” As modified by the Court, this subdivision also requires that
prior to recommending a change in districts, the assessment committee and the supreme court shall consider less disruptive adjustments including, but not limited to, the addition of judges, the creation of branch locations, geographic or subject-matter divisions within districts, deployment of new technologies, and increased ratios of support staff per judge.
The Workload and Jurisdiction Committee recognized that the realignment of ap *622 pellate districts is inherently disruptive to the courts, the legal community, and the public. As the Committee explained, “The transfer of a judicial circuit from one district to another subjects the residents of the circuit to a period of transition in the venue of appeals, as well as a transitional period regarding the controlling law in areas of the law where there is conflict between or among districts. Thus, realignment is unsettling not only for the district courts, but for the circuit courts and the judges, parties and attorneys within them as well.” Workload and Jurisdiction Committee Report at 11.
The addition of a sixth, and possibly seventh, appellate district also could have consequences not noted by the Workload and Jurisdiction Committee. A primary component of this Court’s discretionary review jurisdiction is its article V, section 3(b)(3) jurisdiction to review district court decisions that expressly and directly conflict with decisions of other district courts or this Court. The addition of one or more district courts would increase the number of conflicts in the law that would exist until resolved by this Court, likely resulting in an increase in the number of petitions for discretionary review filed in this Court in both certified conflict and express and direct conflict cases.[11]
As adopted, subdivision (e) recognizes that in order to avoid disruption, the assessment committee and the Court should consider adjustments less drastic than the reorganization of the appellate districts. The Court determined that this cautionary language, which was originally included in the committee note to the rule, should be included in the rule itself to ensure that the decision to create another appellate district is undertaken only as a last resort when it is clear that the current appellate courts are not functioning effectively and efficiently, and no other options are reasonably available, including the addition of judges or the creation of branch courthouses.
Subdivisions (c)(1) and (c)(2) of the rule articulate this Court’s role in determining whether a change to the appellate districts is necessary or merely desirable.' These subdivisions provide:
(1) The supreme court shall certify a necessity to increase, decrease, or redefine appellate districts when it determines that the appellate review process is adversely affected by circumstances that present a compelling need for the certified change.
(2) The supreme court may certify a necessity to increase, decrease, or redefine appellate districts when it determines that the appellate review process would be improved significantly by the certified change.
According to the Committee, these provisions are based in part on the Constitution’s use of the terms “need” and “necessity” when defining the Court’s authority to establish uniform criteria for determinations under article V, section 9:
The supreme court shall .establish by rule uniform criteria for the determination of the need for additional judges except supreme court justices, the necessity for decreasing the number of judges and for increasing, decreasing or redefining appellate districts. If the supreme court finds that a need exists for ... increasing, decreasing or redefining appellate districts ..., it shall, prior to *623 the next regular session of the legislature, certify to the legislature its findings and recommendations concerning such need.
(Emphasis added.) The Committee determined that the use of the term “necessity” suggests that a more restrictive standard is to be used by the Court when recommending that appellate districts be redefined than when certifying the need for additional judges. Workload and Jurisdiction Committee Report at 12. The two standards set forth in subdivision (c) recognize the Court’s obligation to recommend a change to the appellate districts when circumstances compel, but also recognize the Court’s discretion to recommend a change when improvements are needed.
• Review Criteria:
The assessment committee will evaluate the extent to which the district courts are fulfilling their mission as defined by the traditional goals of the appellate process: independent review, correction of errors, and the development of consistency and clarity in the law. See Committee on District Court of Appeal Performance and Accountability, Judicial Management Council, Report and Recommendations 2 (1999) (articulating mission statement for Florida district courts). The assessment committee also will be guided by the Florida judicial branch vision statement which expresses the essential values to which Florida’s courts aspire as they perform their respective functions: “Justice in Florida will be accessible, fair, effective, responsive and accountable.” Id. at 12.
We agree with the Workload and Jurisdiction Committee’s recommendation that the assessment committee should use recognized methodologies that focus not only on caseloads but also on court functionality and outcomes. Consistent with this “outcomes-based” approach, under subdivision (d), Criteria, the assessment committee must evaluate the district courts and make its recommendations on whether to increase, decrease, or redefine the appellate districts based on the following criteria: effectiveness, efficiency, accessibility to appellate review, professionalism, and condu-civeness to public trust and confidence. Each criterion is accompanied by several specific factors to determine whether the criterion has been met.
The Workload and Jurisdiction Committee recognized that because “justice is an inherently qualitative concept,” the defined criteria will not always be easily quantified. However, we agree with the Committee that with the use of established quantitative methodologies and the application of qualitative research methods, the assessment criteria, when viewed as a whole, “will allow an objective observer to determine whether the district courts are fulfilling their mission.” Workload and Jurisdiction Committee Report at 16.
CONCLUSION
The Court thanks the Workload and Jurisdiction Committee for its hard work and dedication in developing and submitting its recommendations in a timely manner and for the Committee members’ diligent service to the citizens of this State. The Committee’s well-reasoned recommendations have provided this Court with objective, performance-based criteria for assessing our district courts and a certification process designed to assist the Court in ensuring that the district courts are able to fulfill their duties and responsibilities as the primary appellate courts in this State.
Accordingly, we approve the Workload and Jurisdiction Committee’s recommendations and adopt new Rule of Judicial Administration 2.036, as set forth in the appendix to this opinion. The committee *624 notes are offered for explanation only and are not adopted as an official part of the rule. The new rule shall become effective immediately upon the release of this opinion.
It is so ordered.
WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
APPENDIX
Rule 2.036. Determination of the Necessity to Increase, Decrease, or Redefine Appellate Districts
(a) Statement of Purpose. The purpose of this rule is to establish uniform criteria for the supreme court’s determination of necessity for increasing, decreasing, or redefining appellate districts as required by Article V, section 9, of the Florida constitution. This rule also provides for an assessment committee and a certification process to assist the court both in certifying to the legislature its findings and recommendations concerning such need and in making its own rules affecting appellate court structure and jurisdiction.
(b) Assessment Committee. At least once during every eight-year period, beginning after review year 2006, the chief justice shall appoint a committee that shall assess the capacity of the district courts to effectively fulfill their constitutional and statutory duties. The committee shall make a recommendation to the supreme court concerning the decisions that it should make during the process described in subdivision (c).
(1) The assessment committee shall consist of three members from each district: one attorney, one district judge, and one circuit judge.
(2) The committee should be appointed no later than August 31 of the year prior to the review year. It must report its recommendations to the chief justice in writing no later than July 1 of the review year.
(3) The chief justice shall select the chair of the committee.
(4) Prior to the preparation of its report, the committee shall solicit written input from the public and shall hold at least one public hearing.
(5) The Office of the State Courts Administrator, in consultation with the clerks and marshals of the district courts of appeal, shall provide staff support to the committee.
(6) The chief justice shall submit the committee’s recommendations to the supreme court. On or before November 15 of the review year, the supreme court shall certify to the legislature its findings and recommendations.
(c)Certification Process. The certification process balances the potential impact and disruption caused by changes in appellate districts against the need to address circumstances that limit the quality and efficiency of, and public confidence in, the appellate review process. Given the impact and disruption that can arise from any alteration in judicial structure, prior to recommending a change in districts, the assessment committee and the supreme court shall consider less disruptive adjustments including, but not limited to, the addition of judges, the creation of branch locations, geographic or subject-matter divisions within districts, deployment of new technologies, and increased ratios of support staff per judge.
(1) The supreme court shall certify a necessity to increase, decrease, or redefine appellate districts when it determines that the appellate review process is adversely affected by circumstances that present a compelling need for the certified change.
*625 (2)The supreme court may certify a necessity to increase, decrease, or redefine appellate districts when it determines that the appellate review process would be improved significantly by the certified change.
(d) Criteria. The following criteria shall be considered by the supreme court and the assessment committee:
(1) Effectiveness. The factors to be considered for this criterion are the extent to which:
(A) each court expedites appropriate cases;
(B) each court’s workload permits its judges to prepare written opinions when warranted;
(C) each court functions in a collegial manner;
(D) each court’s workload permits its judges to develop, clarify, and maintain consistency in the law within that district, including consistency between written opinions and per curiam affirmances without written opinions;
(E) each court’s workload permits its judges to harmonize decisions of their court with those of other district courts or to certify conflict when appropriate;
(F) each court’s workload permits its judges to have adequate time to review all decisions rendered by the court;
(G) each court is capable of accommodating changes in statutes or case law impacting workload or court operations; and
(H) each court’s workload permits its judges to serve on management committees for that court and the judicial system.
(2) Efficiency. The factors to be considered for this criterion are the extent to which:
(A) each court stays current with its caseload, as indicated by measurements such as the clearance rate;
(B) each court adjudicates a high percentage of its cases within the time standards set forth in the Rules of Judicial Administration and has adequate procedures to ensure efficient, timely disposition of its cases; and
(C) each court utilizes its resources, case management techniques, and other technologies to improve the efficient adjudication of cases, research of legal issues, and preparation and distribution of decisions.
(3) Access to Appellate Review. The factors to be considered for this criterion are the extent to which:
(A) litigants, including self-represented litigants, have meaningful access to a district court for mandatory and discretionary review of cases, consistent with due process;
(B) litigants are afforded efficient access to the court for the filing of pleadings and for oral argument when appropriate; and
(C) orders and opinions of a court are available in a timely and' efficient manner.
(4) Professionalism. The factors to be considered for this criterion are the extent to which:
(A) each court’s workload permits its judges to have adequate time and resources to participate in continuing judicial education opportunities and to stay abreast of the law in order to maintain a qualified judiciary;
*626 (C)each court’s staff has. adequate time to participate in continuing education and specialized training opportunities.
(5) Public Trust and Confidence. The factors to be considered for this criterion are the extent to which:
(A) each court’s workload permits its judges to have adequate time to conduct outreach to attorneys and the general public within the district;
(B) each court provides adequate access to oral arguments and other public proceedings for the general public within its district;
(C) each court’s geographic territory fosters public trust and confidence;
(D) each court’s demographic composition fosters public trust and confidence; and
(E) each court attracts an adequate, diverse group of well-qualified applicants for judicial vacancies within its district, including applicants from all circuits within the district.
District Court of Appeal Workload and Jurisdiction Committee Notes
2006 Adoption. Article V, section 9 of the Florida constitution states that:
The supreme court shall establish by rule uniform criteria for the determination of the need for additional judges except supreme court justices, the necessity for decreasing the number of judges and for increasing, decreasing or redefining appellate districts. If the supreme court finds that a need exists for ... increasing, decreasing or redefining appellate districts ..., it shall, prior to the next regular session of the legislature, certify to the legislature its findings and recommendations concerning such need.
(Emphasis added.) Thus, the constitution uses only “need” when describing the uniform criteria for certifying additional judges, but uses both “necessity” and “need” when describing the uniform criteria for increasing, decreasing, or redefining appellate districts. The supreme court has never determined whether this language compels differing tests for the two certifications. Subdivision (c) of this rule uses the phrase “certify a necessity.” The Committee on District Court of Appeal Workload and Jurisdiction determined that the two standards set forth in that subdivision recognize the supreme court’s obligation to recommend a change to the structure of the district courts when circumstances reach the level of necessity that compels a change, but also recognize the court’s discretion to recommend a change to the structure of the district courts when improvements are needed.
The criteria set forth in this rule are based on studies of the workload, jurisdiction, and performance of the appellate courts, and the work of the Committee on District Court of Appeal Workload and Jurisdiction in 2005. In establishing these criteria, substantial reliance was placed on empirical research conducted by judicial branch committees and on other statistical data concerning cases, caseloads, timeliness of case processing, and manner for disposition of eases, collected by the Office of the State Courts Administrator Office as required by section 25.075, Florida Statutes (2004), and Florida Rule of Judicial Administration 2.030(e)(2).
The workload and jurisdiction committee considered the impact of computer technology on appellate districts. It is clear that, at this time or in the future, technology can be deployed to allow litigants efficient access to a court for filing of pleadings and for participation in oral argument, and that it can expand the general public’s access to *627 the courts. It is possible that technology will substantially alter the appellate review process in the future and that appellate courts may find that technology permits or even requires different districting techniques. This rule was designed to allow these issues to be addressed by the assessment committee and the supreme court without mandating any specific approach.
The five basic criteria in subdivision (d) are not listed in any order of priority. Thus, for example, the workload and jurisdiction committee did not intend efficiency to be a more important criterion than engendering public trust and confidence.
Subdivision (d)(2)(A) recognizes that the court currently provides the legislature with an annual measurement of the appellate courts’ “clearance rate,” which is the ratio between the number of cases that are resolved during a fiscal year and the new cases that are filed during the same period. Thus, a clearance rate of one hundred percent reflects a court that is disposing of pending cases at approximately the same rate that new cases arrive. Given that other measurements may be selected in the future, the rule does not mandate sole reliance on this measurement.
Subdivision (d)(5)(E) recognizes that a district court’s geographic territory may be so large that it limits or discourages applicants for judicial vacancies from throughout the district and creates the perception that a court’s judges do not reflect the makeup of the territory.

. We have jurisdiction. See art. V, § 9, Fla. Const.; Fla. R. Jud. Admin. 2.130(a).

. The Workload and Jurisdiction Committee members were: The Honorable Chris W. Al-tenbernd, Judge, Second District Court of Appeal (Chair); The Honorable William A. Van Nortwick, Jr., Judge, First District Court of Appeal; The Honorable Melvia B. Green, Judge, Third District Court of Appeal;, The Honorable Martha C. Warner, Judge, Fourth District Court of Appeal; The Honorable William David Palmer, Judge, Fifth District Court of Appeal; The Honorable Henry E. Davis, Circuit Court Judge, Fourth Judicial Circuit; The Honorable Hugh D. Hayes, Chief Judge, Twentieth Judicial Circuit; The Honorable Mark K. Leban, County Court Judge, Miami-Dade County; Ms. Kathryn Senecal Pecko, Judge of Compensation Claims, Miami; The Honorable Thomas D. Hall, Clerk, Supreme Court of Florida; Ms. Raquel A. Rodriguez, General Counsel, Office of the Governor; Mr. Christopher M. Kise, Solicitor General of Florida; Ms. Margaret Good-Earnest, Assistant Public Defender, Fifteenth Judicial Circuit; Mr. Stephen Busey, Attorney, Jacksonville; Mr. John G. Crabtree, Attorney, Key Biscayne; Ms. Rebecca Mercier-Vargas, Attorney, West Palm Beach; Mr. Rodolfo So-rondo, Jr., Attorney, Miami.

. See, e.g., In re Alkire’s Estate, 142 Fla. 862, 198 So. 475, 482 (1940) (supplemental opinion) ("Judicial appeals are not merely formalities; but are intended to aid in administering right and justice by due course of law, as is required by the constitution, as well as to aid in establishing the jurisprudence of the State.").

. See Standards Relating to Appellate Courts § 3.00 cmt. (1994) (“The intermediate appellate court has primary responsibility for review of individual cases and a responsibility, subordinate to that of the highest court, for extending the application of developing law within the doctrinal framework fashioned by the highest court....”).

. In Fiscal Year 2003-04 the district courts of appeal received 24,157 filings and the Supreme Court received 2,473. See Office of the State Courts Administrator, Florida State Courts Annual Report 2004-2005 44 (2005).

. The Committee on District Court of Appeal Performance and Accountability has defined the mission of Florida’s district courts as follows:
The purpose of Florida’s District Courts of Appeal is to provide the opportunity for thoughtful review of decisions of lower tribunals by multi-judge panels. District Courts of Appeal correct harmful errors and ensure that decisions are consistent with our rights and liberties. This process contributes to the development, clarity, and consistency of the law.
Committee on District Court of Appeal Performance and Accountability, Judicial Management Council, Report and Recommendations 2 (1999).

. The emphasis of those bodies has been on objective analysis of reliable and relevant data to guide management decisions related to the district courts. To this end, the Performance and Accountability Commission has developed a comprehensive performance measurement framework for the district courts and has greatly advanced the uniformity and quality of caseload data available for analysis within this framework.

. According to statistics compiled by the Office of the State Courts Administrator, in 1987-88, the 585 postconviction cases filed in the district courts represented 4.4% of all *619 cases. By 2003-04 this number had risen to over 5300 filings, 22% of all district court cases.

. Performance measurement models for appellate courts studied by the Workload and Jurisdiction Committee include the Report of the Commission on Structural Alternatives for the Federal Courts of Appeal (1999); National Center for State Courts, Appellate Court Performance Standards and Measures (1999); Standards Relating to Court Organization (1990); and Standards Relating to Appellate Courts (1994).

. The Chief Justice will immediately appoint a committee to carry out this directive.

. See National Center for State Courts, Appellate Court Performance Standards and Measures 2 (1999) (noting that "[n]ationwide increases in the. number of trial and interme-díate appellate courts have increased the potential for conflicting interpretations of procedural rules and substantive law”).